PERETORE & PERETORE, P.C.
110 Park Street
Staten Island, NY 10306
(718) 667-8785
Attorneys for General Electric Capital Corporation

____/s/ Frank Peretore_____
Frank Peretore, Esq.
FP #7020


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| GENERAL ELECTRIC CAPITAL CORPORATION, | : | Case Number: 08-CV-03378 |
|  | : | Judge Sidney H. Stein |
|  | : |  |
| Plaintiff, | : | ECF CASE |
|  | : |  |
| v. | : |  |
|  | : |  |
| RURAK OCEAN TOURS, INC., ROYAL TOURS | : |  |
| SERVICE, INC., HIROAKI ONUKI, MICHAEL | : |  |
| COLANGELO, PREMIER COACH, INC., AGIM | : |  |
| LOZOJA and MASAHIRO OHNUKI | : |  |
|  | : |  |
| Defendants. | : |  |

------------------------------------------------------------------------x

---

### GENERAL ELECTRIC CAPITAL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

PERETORE & PERETORE, P.C.
Counselors At Law
Attorneys for Plaintiff

Frank Peretore, Esq.
On the Brief

## TABLE OF CONTENTS

Preliminary Statement…………………………………………………………… 2

Statement of Material and Undisputed Facts…………………………………….. 3
    The Parties……………………………………………………………..... 3
    The Underlying Loan Transaction……………………………………… 4
    Extensions and Restructures…………………………………………… 6
    The Alleged 2006 Purchase Offer……………………………………… 7
    The 2007 Restructure of the 1998 Royal Leases……………………… 8
    Defendants' Default……………………………………………………… 9

Legal Argument………………………………………………………………… 10
  I.  Royal, Rorak, Onuki, and Colangelo Are Liable Under the Transaction
     Documents for The Amounts Owing to GE …………………………………..10
    A.  Royal Is Liable Under Its Lease Agreement…………………………………10
    B.  Rurak is Liable to GE Under Its Promissory Note……………………………10
    C.  Royal and Rurak Are Liable On Their Guaranties Of Each Other's
       Obligation's to GE……………………………………………………… 11
    D.  Onuki Is Liable Under His Guaranty Of Royal's Obligations To GE………… 11
    E.  Colangelo Is Liable Under His Guaranties of Royal's Obligations………….. 11
         1.  Colangelo's Fraud Claim Is Barred By The Parol Evidence Rule
            And By Public Policy………………………………………………… 11
         2.  Colangelo Did Not Reasonably Rely Upon Any Statement Regarding
            Notarization Of Guaranties…………………………………………… 13
         3.  Colangelo Does Note State A Claim For Coercion or Duress………… 15
         4.  Colangelo Ratified Both The Allegedly Forged And The Allegedly
            Fraudulent Or Coerced Guaranty…………………………………… 16
         5.  Colangelo Is Equitably Estopped From Denying The Validity Of
            His Guaranty……………………………………………………… 19

  II.  Colangelo's Guaranty Of Royal's Obligations Covers Royal's Guaranty Of
     Rurak's Obligations To GE……………………………………………… 20

  III.  GE's Instistence That Defendants Pay The Deficiency Owing If Defendants
      Accepted The Serta Offer Does Not Affect Its Rights To Damages……………. 22

  IV.  This Court Should Strike Defendants' Jury Demand Under Fed. R. Civ. P. 39(a)
      With Regard To Defendants' Rurak , Royal, Colangelo, and Onuki……………. 22

Conclusion……………………………………………………………………… 25

## TABLE OF AUTHORITIES

**CASES**                                                                 **Page**

American Equities Group, Inc. v. Ahava Dairy Products Corp., 2007 WL 4563487, 2
(S.D.N.Y. 2007)...................................................................................22

Booth v. Irving Nat. Exch. Bank, 82 A. 652, 653 (Md. 1911)........................................21

Citizens Banking Co. v. McKittrick, 1991 WL 79153, 1 -2 (S.D.N.Y. 1991)......................13

Century Pacific Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007).......... 14

Columbus Trust Co. v. Campolo, 110 A.D.2d 616, 617, 487 N.Y.S.2d 105,
108 (2d Dep't.), aff'd, 66 N.Y.2d 701, 487 N.E.2d 282, 496 N.Y.S.2d 425 (1985).............. 12

Credit Alliance Corp. v. Professional Computer Systems, Ltd., 1986 WL 10726, 2
(S.D.N.Y. 1986).................................................................................18,19

David v. American Tel. & Tel. Co., 160 A.D.2d 632, 632, 559 N.Y.S.2d 505 (1st Dep't 1990). 16

Empire Bank v. Bam Const., Inc., 607 S.W.2d 227, 228 (Mo.App. S.D. 1980................... 20

Fannin State Bank v. Grossman, 30 Ill.App.2d 484, 486, 175 N.E.2d 268, 269 (1961).......... 21

Fierro v. Gallucci, 2008 WL 2039545, 3 (E.D.N.Y. 2008)......................................... 14

Graubard Mollen Dannet & Horowitz v. Edelstein, 173 A.D.2d 230, 231, 569 N.Y.S.
2d 639, 640 - 641 (1st Dep't 1991)..............................................................19

Harris Trust and Sav. Bank v. Stephans, 97 Ill.App.3d 683, 690, 422 N.E.2d 1136, 1141,
52 Ill.Dec. 927, 932 (1981).......................................................................20

Herman Miller v. Thorn Rock Realty Co., 46 F.3d 183, 189 (2d Cir.1995)....................... 22

International Multifoods Corp. v. D & M Feed & Produce, Inc., 470 F.Supp. 654
(D. Neb. 1979)................................................................................. 20

Korea Exchange Bank v. A.A. Trading Co., 8 A.D.3d 344, 345, 777 N.Y.S.2d 736, 737, (2d
Dep't. 2004). ................................................................................. 12

Mazurkiewicz v. New York City Health and Hospitals Corp., 2008 WL 4787512, 8 -9
(S.D.N.Y. 2008).............................................................................. 15

Morgan Guar. Trust Co. v. Crane, 36 F.Supp.2d 602, 603 (S.D.N.Y.1999)....................22,23

National Bank of North America v. Around the Clock Truck Service, Inc., 58 Misc.2d 660, 661, 296 N.Y.S.2d 606, 607 (Nassau Co. 1968)…………………………………………….. 12

National Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 667-8 (S.D.N.Y.1991)…………… 22

Orix Credit Alliance v. Phillips-Mahnen, Inc., 1993 WL 183766, 5 (S.D.N.Y. 1993)……. 18,19

Rothschild v. Title Guarantee and Trust Co., 204 N.Y. 458, 464, 97 N.E. 879, 881 (1912)…….19

S.E.C. v. Credit Bancorp, Ltd., 147 F.Supp.2d 238, 256 (S.D.N.Y. 2001……………………….. 18

VKK Corp. v. National Football League, 244 F.3d 114, 122 (2d Cir. 2001)……………………. 16

Weitnauer Trading Co. v. Annis, 516 F.2d 878, 880 (2d Cir.1975)……………………………. 17

Wright v. Eastman Kodak Co. , 445 F.Supp.2d 314, 320 (W.D.N.Y. 2006)……………………. 16

Yaeger v. National Westminster, 962 F.2d 1 (2d Cir.1992)……………………………………. 22

**STATUTES**

Restatement (Second) of Agency, § 103……………………………………………………… 19

**Preliminary Statement**

Plaintiff General Electric Capital Corporation ("GE") seeks partial summary judgment of the liability of defendants Royal, Rurak, Hiroaki Onuki and Michael Colangelo under various leases and guaranties these defendants executed between 1997 and 2007. It is undisputed that Royal and Rurak defaulted on these transactions in about September, 2007. Defendants have also not contested the liability of defendant Onuki. Colangelo, however, has mounted a spirited defense, asserting that one guaranty that bears his name was forged and that two others were the products of fraud. As set forth below, Colangelo's defenses fail as a matter of law, among other things, because he has repeatedly acknowledged and ratified his guaranties, including in a personal financial statement he submitted to GE in support of a lease restructuring. Colangelo's fraud claims amount to a baseless assertion that he cannot be held liable on unnotarized guaranties, when his own testimony reveals that he deliberately did not sign at least one of the guaranties before a notary so that he could later use the absence of notarization as a pretext for disclaiming liability. In essence, Colangelo pleads his own fraud in defense.

In addition, GE moves to strike the jury demands of Royal, Rurak, Onuki, and Colangelo based upon the jury waivers that these parties executed in their leases and guaranties.[1]

---

[1] Defendant Premier Coach, Inc. has agreed to joint and several liability with defendants Royal and Rurak, and plaintiff is simply awaiting signature of its Agreement. Because the illness of a material witness has delayed discovery on damages and drafting of expert reports, plaintiff is seeking only partial summary judgment at this time. It is not moving against defendant Masahiro Ohnuki because he is apparently deceased.

## Statement Of Facts

### The Parties

Royal and Rurak are tour bus companies.  In 1997, Onuki was president of Royal and owned 93% of Royal's shares. (Rule 56.1 Statement No. 12) The remaining shares were owned by defendant Colangelo, who was Royal's vice-president. (Rule 56.1 Statement No. 13) Rurak, at that time, was wholly owned by Onuki. (Rule 56.1 Statement No. 85).  Despite his status as a minority shareholder, Colangelo played a prominent role in both businesses; he wrote to brokers about obtaining financing and was the primary contact with GE for over a decade, not just about payment issues but about loan extensions and restructuring. (Rule 56.1 Statement No. 5, 22, 87 and 88) In about 2004, Onuki transferred all his shares in both companies to Colangelo. (Rule 56.1 Statement No. 86 and 89) Colangelo consolidated the businesses by combining operations and fleets under Rurak's name, leaving Royal as a shell corporation. (Exhibit A to Peretore Affidavit at 21-4)  Colangelo claims that in about 2006 he sold his shares of Rurak to Agron Lozoya in exchange for Lozoya's assumption of Royal's liabilities and its agreement to indemnify Colangelo, although curiously Colangelo has not asserted a cross-claim for indemnification. Colangelo negotiated this stock purchase agreement without assistance of counsel (Id. at 30-31 and 47) Colangelo testified that he continued to act as a consultant to Rurak after the sale. (Id. at 51)

Colangelo is a Princeton graduate. (Rule 56.1 Statement 82) According to the website, Colangelo serves as a partner and chief operating officer of Colangelo & Partners Public Relations.  The website states that Colangelo "has owned and operated several businesses over his 25-year entrepreneurial career."  The same biographical description boasts that Colangelo "has grown his company into one of New York City's largest tour and charter bus companies."

3

The site also touts Colangelo as the owner of Michaelny, an English language school and bread and breakfast in New York City. (Exhibits E and F to Peretore Affidavit)  At deposition, Colangelo denied that he was a partner in Colangelo & Partners Public Relations, but admitted that he had never told Colangelo & Partners Public Relations that the information was false. (Rule 56.1 Statement 83) The Michaelny website states that Colangelo owned a language school and travel agency in Osaka, Japan, and that Colangelo "spent the past 15 years running a bus company and tour company here in New York City." (Exhibit F to Peretore Affidavit)

**The Underlying Loan Transactions**

On about March 27, 1997, Royal entered a lease with debis Financial Services, Inc. to finance the acquisition of two Setra buses. (Rule 56.1 Statement 1) Prior to entry into the 1997 Royal Lease, Royal entered a March 24, 1997 Revised Trac Lease Commitment. The Revised Trac Lease Commitment was sent by the broker Shore Funding Ltd to Colangelo, as Royal's vice-president, and listed Colangelo, Onuki and Masahiro Ohnuki as personal guarantors. Colangelo signed the commitment and noted on the letter that "[W]e are ready to finalize and sign at any time at your convenience." (Rule 56.1 Statement 2-5). Masahiro Ohnuki and Ohnuki executed an absolute, unconditional, and continuing guaranty in conjunction with the 1997 Royal Lease on about March 27, 1997. (Rule 56.1 Statement 6-7) A second absolute, unconditional, and continuing guaranty was also executed on about March 27, 1997 in the name of Michael Colangelo. (Rule 56.1 Statement 8) Colangelo, despite his written consent to the terms of the Commitment, denies that the signature is his. (Exhibit A to Peretore Affidavit at 101-2) In interrogatory answers, Colangelo maintains that he discovered sometime in 2005 that his signature had been forged on the debis guaranty but conceded that he took no steps to alert GE, to whom debis had assigned the transaction in 1998, to the forgery. (Exhibit B to Peretore

4

Affidavit) In fact, at the time of the assignment, GE was provided with a letter dated December 28, 1998 signed by Hiroaki Onuki on behalf of Royal, in which Onuki confirmed that the Lease "and all the documents associated therewith, have been duly and validly executed...." (Rule 56.1 Statement 10-11)

In March, 1998, Colangelo contacted DeAngelis about Royal's interest in financing the acquisition of additional Setra buses. (Rule 56.1 Statement 22) On about October 8, 1998, Royal entered a lease with GE to finance two additional Setra buses. (Rule 56.1 Statement 23) On about October 14, 1998, Onuki executed an absolute, unconditional, and continuing guaranty of Royal's obligations. (Rule 56.1 Statement 24-5) On about October 16, 1998, Colangelo executed an absolute, unconditional, and continuing guaranty. (Rule 56.1 Statement 26)    Colangelo contests the validity of his guaranty, contending that he was coerced and fraudulently induced into entering it.    Colangelo testified that GE would not release the Setra buses without the guaranty, and Royal had already sent drivers to pick them up.    Colangelo testified that because an instruction letter dated October 8, 1998 sent by GE and addressed Onuki stated under the heading "continuing guaranty" that "required signatures must be executed in the presence of a Notary Public," he believed that if he signed the guaranty without notarization the guaranty would be ineffective.    He testified that in a telephone conversation, DeAngelis, with an alleged and unidentified representative of GE also on the line, assured him that the "guaranty doesn't mean anything unless it's notarized." (Exhibit A at 108-116   and Exhibit G to Peretore Affidavit).

On about March 15, 2000, Rurak entered a lease with GE to finance the acquisition of two MCI buses.  (Rule 56.1 Statement 31) Onuki and Royal executed absolute, unconditional, and continuing guaranties on about March 16, 2000 (Rule 56.1 Statement 32-5).    On about

March 16, 2000, Royal and Rurak signed a Cross-Collateral and Cross-Default Agreement under which a default under any account with GE would be deemed a default under all accounts. (Rule 56.1 Statement 36 and Exhibit O to Graff Affidavit)

**Extensions and Restructures**

From the outset, Royal and Rurak encountered difficulties in making payments under the leases. Each of the three transactions was extended or modified at various times (Rule 56.1 Statement 14, 27, 37)

In 2000, Colangelo signed an Amendment Agreement to the 1997 Royal Lease. Although claiming that he did not learn that his signature on the 1997 guaranty had been forged until 2005, Colangelo signed the Amendment Agreement as a guarantor under language that stated:

By their execution below, each of the guarantors, for valuable consideration, hereby consents, agrees and affirms his/her or its respective guaranty of Lessee's/Obligor's obligations under the Lease/Financing Agreement and each such guaranty shall remain in full force and effect, without variance, qualification, diminution or change whatsoever by reason of this Agreement or otherwise.

(Rule 56.1 Statement 15-17) In 2003, Colangelo signed a Lease Modification Agreement to the 1997 Royal Lease. Colangelo signed the 2003 Lease Modification Agreement as a guarantor agreeing to language that confirmed and ratified the 1997 guaranty:

The undersigned Guarantor hereby agrees and consents to all of the terms, conditions and modifications set forth herein and confirms that its Guaranty of Lessee's obligations under the Lease as modified herein remains in full force and effect and is ratified and confirmed by Guarantor.

(Rule 56.1 Statement 18-20) The parties executed a Lease Renewal Agreement dated as of July 1, 2005 to the 1997 lease. (Rule 56.1 Statement 21)

The 1998 Lease also underwent various amendments. On Amendment No. 1 to the 1998 Lease, Colangelo signed as a guarantor, agreeing to language that confirmed his prior guaranty:

The undersigned Guarantor hereby agrees and consents to all of the terms, conditions and modifications set forth herein and confirms that its Guaranty of Lessee's obligations under the Lease as modified herein remains in full force and effect and is ratified and confirmed by Guarantor.

(Rule 56.1 Statement 27-30)

As for the Rurak lease, it too underwent various extensions or modifications, finally being converted into a loan on about December 30, 2005 when Colangelo signed a promissory note and master security agreement covering the two MCI buses that had been collateral under the Rurak lease as well as an absolute, unconditional, and a continuing guaranty on behalf of Royal of Rurak's obligations to GE. (Rule 56.1 Statement 37-38)

**The Alleged 2006 Purchase Offer**

On November 15, 2006, Colangelo reported to GE by e-mail that he had received an offer from Setra to purchase the four Setra buses that were the subject of the 1997 and 1998 leases. Colangelo acknowledged that the offer of $70,000 apiece for the 1997 Setra buses and between $100,000 to $105,000 for the 1999 Setra buses would leave a shortfall of about $40,000. The e-mail indicates that the $40,000 deficiency did not include existing late charges, which were over $19,000. In addition, Colangelo did not make provision for payment of sales tax, which was expected to be more than $33,000 on all four buses. (Rule 56.1 Statement 39-42)) The purported offer did not encompass the Rurak buses. GE was willing to entertain the offer, contingent upon Colangelo paying the deficiency. (Rule 56.1 Statement 45) Colangelo testified that defendants could not pay the shortfall. (Rule 56.1 Statement 44)

At deposition, Colangelo testified that the Setra salesman that he had spoken with had stated that certain repairs needed to be made. Colangelo testified that one of the buses did not have an engine or transmission; that a second bus had "considerable body damage;" and that a third bus, at the time of the purported offer, also had transmission problems, although that bus

7

subsequently did receive some repairs. (Exhibit A to Peretore Affidavit at 74-6) GE was not told

that there was significant damage to its collateral. (Graff Affidavit at paragraph 24)

**The 2007 Restructure Of The 1998 Royal Lease**

    In late 2006, the parties began exploring restructuring the 1998 lease.  On October 27,

2006, Kenneth Rohrman wrote to Colangelo about a restructure.    Rohrman stated that

reaffirmance of his personal guaranty would be a requirement of any new transaction. Rohrman

stated, "When you originally signed the renewal docs for this deal, yourself and Hiroaki Onuki

signed Individual Guaranty's for the deal.  I am going to need the both of you to reaffirm these

documents."  (Rule 56.1 Statement 46-8) Colangelo did not respond or in any way object to the

description of him as a guarantor.  (Rule 56.1 Statement 49) On November 20, 2006, GE sent

Colangelo a default letter informing him that Royal was in default and that "yourself, as

individual guarantor, will be responsible for the deficient installments under the terms agreed

upon."  (Rule 56.1 Statement 50-51) Again Colangelo did not respond or object to the

characterization of him as a guarantor. (Rule 56.1 Statement 52)

    The correspondence leading up to entry into the 2007 confirms that Colangelo knew he

was a guarantor and that he affirmatively represented to GE that he was a guarantor.

    On February 16, 2007, Dale Shores provided renewal terms to Colangelo.  Among the

terms of the renewal were provisions that "[c]urrent guarantees would remain in place" and that

GE "[a]lso need[ed] either most recent tax return or personal financial statement from you as a

PG." (Rule 56.1 Statement 53-54) On February 26, 2007, Shores again wrote to Colangelo

reiterating the proposal that included "current guarantee remain in place" and again requesting

Colangelo's personal financial statement. (Rule 56.1 Statement 56).  Far from questioning the

characterization of himself as a guarantor, on March 30, 2007, Colangelo faxed his personal

financial statement to Shores. Colangelo admits that he prepared the personal financial statement himself. (Exhibit A to Peretore Affidavit) Under liabilities Colangelo lists "Ge Capital (Contingent Liability: Guarantee of bus loan to GE Capital)." (Rule 56.1 Statement 57-59) On June 4, 2007, Shores e-mailed the lease renewal documents to Colangelo. The documents e-mailed were enumerated and included an individual guaranty for Michael Colangelo. Shores instructed Colangelo to have notarized a limited power of attorney but did not require any other signature to be notarized. The June 4, 2007 e-mail did not require Colangelo's personal guaranty to be notarized (Rule 56.1 Statement 61-63)

Royal entered into a restructure of the 1998 Royal Lease by executing a Lease Renewal Amendment as of April 1, 2007. (Rule 56.1 Statement 64) In conjunction with the Lease Renewal Amendment, Colangelo signed an absolute, unconditional, and continuing guaranty and Rurak signed a corporate guaranty, which was also an absolute, unconditional, and continuing guaranty. (Rule 56.1 Statement 65-68) Rurak also executed a Master Security Agreement, putting up a Van Hool Bus as additional collateral. (Rule 56.1 Statement 69) These documents were forwarded by Colangelo to GE by fax on July 6, 2007, with the exception of the stipulated loss value table because Colangelo objected to the proposed stipulated loss value table; he faxed a revised table to GE on about July 20, 2007. (Rule 56.1 Statement 70-71)

**Defendants' Default**

Despite the latest renewal, defendants were unable to keep current on their accounts. On August 23, 2007, Shores e-mailed Colangelo, "Need you to get involved in this matter. Accounts are seriously delinquent and you are personally liable." (Rule 56.1 Statement 72) On October 15, 2007, Shores again e-mailed Colangelo, "Need you to call me to discuss your accounts with GE and your personal guaranty." (Rule 56.1 Statement 73) In neither case did

Colangelo object to the description of him as a guarantor.  (Rule 56.1 Statement 74, Graff

Affidavit at paragraph 16) Royal failed to make payment under the 1997 lease documents

beginning with the payment due in September, 2007. Royal failed to make payment under the

1998 lease documents beginning with the payment due in September, 2007. Rurak failed to make

payment under the its loan documents beginning with the payment due in September, 2007.

Royal and Rurak's failure to make payment constitutes an event of default under the lease and

loan transaction documents and under the Cross-Default Agreement.  Upon receiving notice

from GE that the accounts were in default, Colangelo did not dispute that the accounts were in

default. (Rule 56.1 Statement 76-81) By reason of the default, GE has suffered damages of over

$700,000 as of October 10, 2008.

### Legal Argument

### I. Royal, Rurak, Onuki, and Colangelo Are Liable Under The Transaction Documents For The Amounts Owing To GE.

### A. Royal Is Liable Under Its Lease Agreements.

It is undisputed that Royal entered a lease with debis in 1997 and that the lease was

subsequently assigned to GE.  It is also undisputed that Royal entered into a lease with GE in

1998. It is undisputed that Royal is in default under both the 1997 and 1998 leases. Additionally,

because Rurak has defaulted under its obligations to GE, Royal is also liable under the Cross-

Collateral and Cross-Default Agreement. Accordingly, this Court should enter summary

judgment against Royal and in favor of GE.

### B. Rurak Is Liable To GE Under Its Promissory Note.

It is undisputed that Rurak entered into a promissory note with GE in December, 2005.  It

is undisputed that Rurak is in default under the 2005 Promissory Note.  Additionally, because

Royal has defaulted under its obligations to GE, Rurak is also liable under the Cross-Collateral

and Cross-Default Agreement. Accordingly, this Court should enter summary judgment against Royal and in favor of GE.

**C. Royal and Rurak Are Liable On Their Guaranties Of Each Other's Obligation's To GE.**

Rurak executed an absolute, unconditional, and continuing guaranty of Royal's obligations in 2007. Royal's default under the 1997 and 1998 leases triggers Rurak's liability under the guaranty. Royal executed absolute, unconditional and continuing guaranties of Rurak's obligations in 2000 and 2005. Rurak's default under the 2005 Promissory Note triggers Royal's liability under its guaranties. Accordingly, this Court should enter summary judgment against Royal and in favor of GE.

**D. Onuki Is Liable Under His Guaranty of Royal's Obligations To GE.**

Onuki executed absolute, unconditional, and continuing guaranties of Royal's obligations to GE in 1997 and 1998. Royal's default under the 1997 and 1998 leases triggers Onuki's liability as a guarantor. In addition, Onuki executed an absolute, unconditional, and continuing guaranty of Rurak's obligations in 2000. Rurak's default under its loan triggers Onuki's liability under his guaranty. Accordingly, this Court should enter summary judgment against Onuki and in favor of GE.

**E. Colangelo Is Liable Under His Guaranties Of Royal's Obligations.**

Colangelo executed guaranties of Royal's obligations in 1997, 1998, and 2007. He maintains that the 1997 guaranty was forged. He argues that he was coerced and defrauded into entering the 1998 guaranty, and that the alleged fraud infected his 2007 guaranty as well. As set forth below, Colangelo's defenses fail as a matter of law.

**1. Colangelo's Fraud Claim Is Barred By The Parol Evidence Rule And By Public Policy.**

Colangelo contends that in 1998 he signed an individual guaranty based upon the alleged telephone assurance of his broker Joe DeAngelis that the guaranty "doesn't mean anything anyway, it's not a legal document, it's not notarized." He claims that he was told by DeAngelis in that conversation along with an unidentified individual whom he claims was a GE representative that "personal guaranties have to be notarized" and that Colangelo was required to execute the guaranty to complete the paperwork. He also points to a GE document that says that "required signatures must be executed in the presence of a Notary Public" to contest the validity of his 1998 individual guaranty. In fact, guaranties are effective without notarization. Columbus Trust Co. v. Campolo, 110 A.D.2d 616, 617, 487 N.Y.S.2d 105, 108 (2d Dep't.), aff'd, 66 N.Y.2d 701, 487 N.E.2d 282, 496 N.Y.S.2d 425 (1985)("defendant's allegation that the guarantee was not executed in the presence of a notary, and is thus void, is without merit since a notary's acknowledgement was not necessary to make the guarantee legally binding on the parties.")

Colangelo's fraud claim is barred by the parol evidence rule. Squarely on point is Korea Exchange Bank v. A.A. Trading Co., 8 A.D.3d 344, 345, 777 N.Y.S.2d 736, 737, (2d Dep't. 2004). In that case a guarantor claimed that he was told by the plaintiff's representative that the execution of the guaranty was a mere formality and he would not be responsible for the underlying debt was not a sufficient defense. The Court granted summary judgment in favor of the plaintiff bank, stating, "If such an oral assurance was made, then it not only varied the terms of the guaranty, but amounted to a promise that the guaranty would not be enforced. 'To recognize that such an oral assurance could constitute a defense to this action would violate the parol evidence rule'." In the same vein is National Bank of North America v. Around the Clock Truck Service, Inc., 58 Misc.2d 660, 661, 296 N.Y.S.2d 606, 607 (Nassau Co. 1968) in which a

guarantor attempted to repudiate his guaranty, claiming that the borrower had told him in the presence of bank officers that the guaranty was a mere formality and that he would in no manner be held liable. The Court granted summary judgment to the bank, holding that the guarantor was "estopped by public policy from asserting that the parties agreed that the instrument should not be enforced." See also, Citizens Banking Co. v. McKittrick, 1991 WL 79153, 1 -2 (S.D.N.Y. 1991)(granting summary judgment against guarantor who claimed that it was his understanding that the guaranty was a mere formality, that the bank would be looking solely to the notes of the limited partners for repayment, and that the bank advised him not to be concerned)

## 2. Colangelo Did Not Reasonably Rely Upon Any Statements Regarding Notarization Of Guaranties.

Colangelo states that he executed the 1998 guaranty based upon a document issued by GE indicating that guaranties must be notarized. He further claims that he received the identical information from the broker, Joe DeAngelis. Colangelo did not reasonably rely upon these statements in 1998. In addition, although Colangelo asserts that subsequent guaranties were also fraudulently induced since as late as 2007 he relied upon the same 1998 statements that guaranty "doesn't mean anything until it's notarized", any claim of continued reliance is all the more unreasonable in light of the events and correspondence between 1998 and 2007.

First, Colangelo relies primarily upon a document issued by GE and addressed to Onuki that says "required signatures must be executed in the presence of a Notary Public." The document does not say that guaranties are ineffective unless notarized, and no reasonable person, let alone a Princeton graduate, would interpret the document to mean anything other than that GE was asking guarantors to sign before a notary. However, the intention of requesting the notarization was to protect GE, not the guarantor, especially a guarantor who does not dispute the authenticity of his signature.

Second, Colangelo did not justifiably rely upon the oral representations of DeAngelis and an unknown person whom he believed was a GE representative.[2] These individuals were not lawyers and he was not entitled to rely upon any legal representation that they allegedly made.

Third, the 1998 guaranty Colangelo signed did not have a jurat or any other space designated for signature by a notary. The individual and corporate guaranties executed by Onuki in 1998 and the guaranties executed by defendants in 1997 also did not have jurats or a space designated for signature by a notary.

By 2007, when Colangelo again executed a guaranty of Royal's obligations, he unequivocally knew that a guaranty did not have to be notarized to be effective. Colangelo had signed a corporate guaranty along with ratifications of his own guaranty. He was not directed to sign these before a notary and these instruments, five altogether, did not contain jurats or a designated space for a notary to sign. Colangelo's 2007 guaranty was accompanied by instructions that did not require notarization. In addition, beginning in late 2006 and prior to his execution of the 2007 guaranty, Colangelo received at least a dozen written communications including default letters from GE identifying Colangelo as a guarantor. He admits that he had discovered by 2005 that DeAngelis had allegedly forged Colangelo's signature to the 1997 guaranty, which would have awakened a reasonable person into inquiring into DeAngelis's conduct in 1998, although having signed as a guarantor to the 1997 Royal Lease as early as 2000, it is evident Colangelo knew about the alleged forgery much earlier. In fact, in 2007, far from relying upon the supposed misrepresentation made nine years previously, Colangelo

---

[2] Under New York law, fraud must be proved by clear and convincing evidence. Century Pacific Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007). The reference to an unidentified GE representative not only is hearsay but does not even satisfy the standard for pleading fraud claims under Rule 9(b), let alone the clear and convincing standard. "[F]raud allegations in a complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Fierro v. Gallucci, 2008 WL 2039545, 3 (E.D.N.Y. 2008)

induced GE to restructure one of the subject transactions by submitting a personal financial statement that he prepared himself that acknowledged that he was a GE guarantor.

### 3. Colangelo Does Not State A Claim For Coercion Or Duress.

Colangelo asserts that he was coerced into entering the 1998 guaranty because Royal had representatives prepared to pick up the buses at the manufacturer on the very day that he was told that his guaranty was required. "[T]o make out a claim of economic duress, a plaintiff must establish "that the agreement was obtained: (1) by means of wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative." Mazurkiewicz v. New York City Health and Hospitals Corp., 2008 WL 4787512, 8 -9 (S.D.N.Y. 2008).

Colangelo does not allege that GE made any improper threat to coerce him into entering the 1998 guaranty. It was GE's prerogative to insist upon what it deemed adequate security for financing buses that were worth over $700,000, and, in fact, it behaved consistently with industry practice in which guaranties of principals of a closed corporation are typically required. It behaved no differently from debis, which insisted upon Colangelo's guaranty, nor did it behave any differently from U.S. Bancorp Equipment Finance, Inc, in an earlier transaction in which Colangelo also apparently executed a guaranty.[3] If the defendant's actions are within its legal rights, then a plaintiff cannot make out a claim for economic duress. Id.

What is more, Colangelo did not act promptly to repudiate the guaranty. Not until ten years after the guaranty was executed, after the commencement of this lawsuit, a period that far exceeds the six-year statute of limitations for a contract action, did he even mention that he

---

[3] Colangelo also has contended that guaranty was forged, in a very unusual coincidence. See U.S.Bancorp Equipment Finance, Inc. v. Royal Tours Inc., et al. commenced in this district under docket number 1:06-cv-05288. Colangelo's forgery defense in the seventh affirmative defense in defendants' answer in that matter, number 19 on the docket.

15

believed he had been coerced in 1998. More important, however, the law in New York is clear that "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." <u>VKK Corp. v. National Football League,</u> 244 F.3d 114, 122 (2d Cir. 2001). If the releasing party does not promptly repudiate the contract or release, he will be deemed to have ratified it. A party may ratify a contract or release entered into under duress by "intentionally accepting benefits under the contract," by "remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it," or by "acting upon it, performing under it, or affirmatively acknowledging it." <u>Wright v. Eastman Kodak Co.,</u> 445 F.Supp.2d 314, 320 (W.D.N.Y. 2006) <u>See also. David v. American Tel. & Tel. Co.,</u> 160 A.D.2d 632, 632, 559 N.Y.S.2d 505 (1st Dep't 1990) ("A contract allegedly executed under duress is voidable, not void, and a plaintiff must demonstrate his decision to challenge that contract rather than to ratify it by accepting its benefits, even where he faces the hard choice of eschewing those benefits in order to pursue his legal rights").

Not only did Colangelo accept the benefits through Royal of the 1998 lease with GE, but Onuki and Rurak entered into a lease with GE in 2000, only eighteen months later. Had GE acted improperly, one might have supposed that Colangelo would have mentioned it to his business colleague, Onuki, who assuredly would have sought funding for Rurak elsewhere.

## 4.   Colangelo Ratified Both The Allegedly Forged And The Allegedly Fraudulent Or Coerced Guaranty.

Whether or not fraud or forgery or coercion was committed in connection with the 1998 and 2000 guaranties is, in any event, immaterial because Colangelo not only freely signed a new absolute, unconditional, and continuing guaranty in 2007, but he also ratified his pre-existing guaranties, most prominently in his own personal financial statement, which he prepared himself and transmitted to GE to induce GE to restructure one of the leases at issue. In fact, if any party

16

were defrauded it was GE, which repeatedly obtained express ratifications from Colangelo of his guaranty without Colangelo mentioning that he did not view himself as a guarantor although he silently accepted for his company the benefits of each lease transaction or restructure.

Although Colangelo admits that in 2005 he knew that the 1997 guaranty was forged, in fact, Colangelo was aware of the alleged forgery as early as 2000, when GE asked him to ratify his guaranty of the 1997 debis lease. Colangelo signed the ratification in 2000 without objection, although one might have expected an individual who portrays himself as a victim of forgery to have asked what guaranty he was ratifying. Moreover, assuming that Colangelo reasonably relied upon any communication made to him in 1998 that a guaranty had to be notarized, by the time he signed his 2007 guaranty he knew that GE understood that he was a guarantor; indeed in his personal financial statement, Colangelo described himself as a guarantor of GE. He knew that GE was relying upon the personal financial statement in consenting to the 2007 restructure.

Colangelo, thus, expressly and by conduct ratified each guaranty. He signed at least three documents, two ratifying the 1997 guaranty, and another the 1998 guaranty in connection with loan extensions that he requested. He was repeatedly and compulsively silent although he received at least seven communications between 2006-2007 from GE that identified Colangelo as a guarantor, including a default notice he received in 2006. In 2007, after admittedly becoming aware of the alleged forgery and after signing five additional guaranties and ratifications of guaranties, none of which he was told to notarize, he prepared and submitted to GE a personal financial statement in which he expressly acknowledged his guaranties to entice GE to restructure the 1998 transaction.

"It is well-settled that ratification of an unauthorized signature on a guaranty will make a party liable on that guaranty." Weitnauer Trading Co. v. Annis, 516 F.2d 878, 880 (2d Cir.1975).

17

Such ratification requires three elements: (1) acceptance of the benefits of the transaction (2) with full knowledge of the facts, and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangement. Credit Alliance Corp. v. Professional Computer Systems, Ltd., 1986 WL 10726, 2 (S.D.N.Y. 1986).  In this case, each of these elements is satisfied.  Colangelo accepted the benefits of each of the guaranties. These guaranties enabled Royal and Rurak to secure and continue to operate six buses, around 25% of their fleet. Additionally, as noted, by 2007 Colangelo had full knowledge of the facts; indeed, he admitted he was a guarantor to obtain a restructure of the 1998 lease.  Finally, the circumstances are clear that Colangelo made an affirmative election indicating an intention to adopt the two challenged guaranties.  In Credit Alliance, the Court found an election when the guarantor "knew her name was signed to both guaranties, she had ample opportunity to inform Credit Alliance of the forgery and remained silent." Similarly, Colangelo knew his name had been signed to the 1997 guaranty, knew that GE perceived him as a guarantor, and that he was being asked to sign ratification and guaranty after ratification after guaranty without notarization, but did not tell GE about the forgery or the alleged fraud. At the same time, not only did he sign express ratifications but he acknowledged his liability as a guarantor in a personal financial statement to obtain additional credit. "A finding of ratification will defeat even a valid claim of misrepresentation where the party seeking to avoid the contract does not take prompt action after discovery of the alleged false statement. When determining ratification, the key factors are 'whether [the] party silently acquiesced in the contract or rather promptly interposed his objections upon discovering the basis for the claim of rescission.'"  S.E.C. v. Credit Bancorp, Ltd., 147 F.Supp.2d 238, 256 (S.D.N.Y. 2001). Colangelo silently acquiesced in the contract and did not promptly interpose his objections after discovering a basis for rescission. See also, Orix Credit Alliance v.

Phillips-Mahnen, Inc., 1993 WL 183766, 5 (S.D.N.Y. 1993)(finding ratification by silence of forged signature to a guaranty when alleged guarantor did not respond to lessor's verification letter); Graubard Mollen Dannet & Horowitz v. Edelstein, 173 A.D.2d 230, 231, 569 N.Y.S.2d 639, 640 - 641 (1st Dep't 1991)(defendants waived their present defenses and ratified their obligations under the Promissory Note and Guaranty by soliciting and accepting an extension of time to fulfill their obligations to the plaintiff and in executing a May 15, 1987 Agreement acknowledging their indebtedness to the plaintiff, at a time when the defendants were aware of the plaintiff's alleged antecedent fraud).

### 5. Colangelo is Equitably Estopped From Denying The Validity Of His Guaranty.

"[Equitable estoppel] operates against an unjust repudiation of a ... forged instrument. It does not require the positive, distinct action or language needed and intended to renew and ratify a transaction and make it valid and binding; it prohibits a person, upon principles of honesty and open dealing, from asserting rights, the enforcement of which, through his omissions and commissions work fraud and injustice." Credit Alliance, supra at 1993 WL 183766. Rothschild v. Title Guarantee and Trust Co., 204 N.Y. 458, 464, 97 N.E. 879, 881 (1912). See also, Restatement (Second) of Agency, § 103, comments a, b, and c and illus. 4 ("[I]f the one whose signature is simulated assists in misleading or culpably fails to inform the deceived person and such person changes his position in reasonable reliance upon the situation as he believes it to be, he is bound by the rules of estoppel."). A failure to speak may give rise to equitable estoppel if a party remains silent when he had the opportunity to speak, and when he knew or ought to have known that his silence would be relied upon, that action would be taken or omitted based upon his silence, and that injury of some nature would result. Rothschild, 204 N.Y. at 462. A party asserting estoppel must show: (1) lack of knowledge of the true facts; (2) good faith reliance; and

19

(3) a detrimental change of position. In this case, Colangelo remained willfully silent about the alleged forgery even after he was well aware of the facts and willfully silent about the purported fraud even after he knew GE regarded him as a guarantor. GE had no reason to know about the forgery. The 1997 guaranty had been assigned to GE along with a document signed by Onuki attesting to the validity of all the transaction documents, including Colangelo's guaranty. GE had no reason to know, especially after Colangelo signed ratification after ratification and acknowledged his guaranty in his personal financial statement that Colangelo believed that the 1998 guaranty and subsequent ratifications as well as the 2007 guaranty were invalid. In reliance upon both Colangelo's silence, his express ratifications and ultimately his affirmative representation that he was liable to GE as a guarantor, GE continued to grant extensions, renewals and restructures. Colangelo is estopped by his silence from challenging any of his guaranties.

## II. Colangelo's Guaranty of Royal's Obligations Covers Royal's Guaranty of Rurak's Obligations To GE.

"The general rule is that a comprehensive guaranty of debts covers both the primary and secondary liability of the principal." Empire Bank v. Bam Const., Inc., 607 S.W.2d 227, 228 (Mo.App. S.D. 1980) (guaranty of "indebtedness, liabilities and obligations of every nature and kind" and "every balance and part thereof," past, present or future, and with "NO LIMIT" extended to guaranty executed by principal). See also, International Multifoods Corp. v. D & M Feed & Produce, Inc., 470 F.Supp. 654 (D. Neb. 1979)( guaranty of "all indebtedness" of son-in-law, "direct or indirect, absolute or contingent" encompassed obligations under principal's guaranty); Harris Trust and Sav. Bank v. Stephans, 97 Ill.App.3d 683, 690, 422 N.E.2d 1136, 1141, 52 Ill.Dec. 927, 932 (1981)(guaranty of any and all indebtedness, obligations and liabilities (whether direct or contingent or now or hereafter due or now or hereafter incurred) covered

20

corporate guaranty); <u>Booth v. Irving Nat. Exch. Bank</u>, 82 A. 652, 653 (Md. 1911) (guaranty of all obligations, "direct and indirect," was held sufficient to apply to the second obligation of the debtor); <u>Fannin State Bank v. Grossman,</u> 30 Ill.App.2d 484, 486, 175 N.E.2d 268, 269 (1961)(guaranty of any and all indebtedness and liability of every kind, nature and character encompasses secondary liability of principal).

In this case, Colangelo guaranteed Royal's obligations under three different guaranties. In turn, Royal guaranteed Rurak's obligations under two different guaranties. Colangelo's guaranties were absolute, unconditional and continuing. The 1997 guaranty provided:

> Guarantor unconditionally and irrevocably guarantees the payment and performance of any and all obligations of Lessee to Lessor, whether currently existing or are hereafter created ("Guaranteed Obligations"). The Guaranteed Obligations specifically include, but are not limited to, any obligation of Lessee to Lessor in connection with the Collateral, whether arising under the Agreement or otherwise. This Guaranty is continuing in nature....

The 1998 and 2007 guaranties were also extremely broad and by their terms encompassed Royal's secondary liability:

> ....the due regular and punctual payment of any sum or sums of money which the Customer may owe to you now or at any time hereafter, whether evidenced by an Account Document, on open account or otherwise, and whether it represents principal, interest, rent, late charges, indemnities, an original balance, an accelerated balance, liquidated damages, a balance reduced by partial payment a deficiency after sale or other disposition of any leased equipment, collateral or security, or any other type of sum of any kind whosoever that the Customer [Royal] may owe to you now or at any time hereafter, and does hereby further guarantee to you, your successors and assigns, the due, regular and punctual performance of any other duty or obligation of any kind or character whatsoever that the Customer may owe to you now or at any time hereafter....

Accordingly, under his guaranties Colangelo is liable for the full amount of Royal's obligations to GE, including Rurak's obligations, which Royal guaranteed.

**III.  GE's Insistence That Defendants Pay The Deficiency Owing If Defendants Accepted The Setra Offer Does Not Affect Its Rights To Damages.**

Defendants argue that GE's rights are somehow impaired because it did not permit Royal to sell the four Setra buses to the manufacturer.  In fact, Colangelo admitted that GE entertained the offer but insisted that defendants pay the deficiency.  Colangelo concedes that there was a $40,000 deficiency, a figure that did not include late fees owing to GE or expected sales taxes, which would bring the deficiency closer to $100,000.  Colangelo further concedes that defendants did not have the funds to pay the deficiency.  GE was not obligated to waive its deficiency and was within its right to insist upon full payment.

**IV. This Court Should Strike Defendants' Jury Demand Under Fed. R. Civ. P. 39(a) With Regard To Defendants' Rurak, Royal, Colangelo, and Onuki.**

With the exception of the 1997 transaction documents, the leases, promissory note, security agreements, and guaranties all contain jury waivers executed by Rurak, Royal, Colangelo, and Onuki.[4] It "well-settled" that "'parties to a contract may, by prior written agreement entered into knowingly and voluntarily, waive the right to a jury trial.'" American Equities Group, Inc. v. Ahava Dairy Products Corp., 2007 WL 4563487, 2 (S.D.N.Y. 2007); Morgan Guar. Trust Co. v. Crane, 36 F.Supp.2d 602, 603 (S.D.N.Y.1999) (citing Herman Miller v. Thorn Rock Realty Co., 46 F.3d 183, 189 (2d Cir.1995)). " [J]ury trial waivers are common in loan agreements and loan guarantees, and these are regularly enforced." National Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 667-8 (S.D.N.Y.1991), aff'd sub nom., Yaeger v. National Westminster, 962 F.2d 1 (2d Cir.1992). The factors a court must consider in determining whether a contractual waiver of a right to a jury trial was entered into knowingly and voluntarily include: 1) the negotiability of contract terms and negotiations between the parties concerning the waiver

---

[4] The fact that the 1997 transaction documents do not contain jury waivers does not alter the analysis because Colangelo's 1998 and 2007 guaranties extended to Royal's obligations then or thereafter existing, and Colangelo, can be held responsible on either of these guaranties, both of which contained jury waivers.

provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver. Morgan Guar. Trust Co. of New York v. Crane, 36 F.Supp.2d 602, 603-4 (S.D.N.Y. 1999).

Morgan Guar. Trust, which upheld a jury waiver, is extremely instructive about application of these factors. First, at bar, as in Morgan, there is no indication that the terms of the guaranties and other transaction documents were not negotiable. "Simply because the [borrowers] did not attempt to negotiate its provisions does not mean that, in fact, the waiver or other terms in the note were not negotiable." Id at 604. In fact, not only did Colangelo successfully request and receive numerous extensions to the various transactions over the years, the documents show that he successfully negotiated changes to the stipulated loss table in the 2007 restructure.

Second, the jury waiver provisions, as in Morgan, were conspicuous. Each was written in bold face in all capital letters. Many were located on the same page as the signature line. The facts show that defendants had possession of the transaction documents for a considerable time before they executed them. Defendants received the 2007 renewal documents, for instance, on June 4, 2007. The executed documents were returned until July 6, 2007. In all, defendants executed thirteen documents containing jury waivers.[5]

Third, as the Court pointed out in Morgan, "although there was clearly a difference in bargaining power between the sides-as there would be between a major bank and virtually any …individuals"-defendants "were not financial neophytes." Onuki, followed by Colangelo, managed two bus companies. Colangelo has allowed himself to be held out to the public as the chief executive officer of Colangelo & Partners and owns yet another business known as michaelny. Colangelo successfully negotiated extensions and changes to various transaction

---

[5] These include Exhibits H, I, J, L, M, N, P, Q, HH, Z, AA, BB, CC. Five of these were signed by Colangelo.

documents. In fact, without counsel, he negotiated a stock transfer agreement of his shares in Rurak that promised him indemnification and in which Rurak's liabilities were assumed by the purchaser.

Fourth, defendants were not inexperienced business people. Colangelo was a Princeton graduate, who managed two bus companies for over a decade. He represented Royal and Rurak with regard to the various extensions and renewal agreements and negotiated a sophisticated agreement when selling his shares in Rurak. [6]

Under these circumstances, defendants' jury demand must be stricken.

---

[6] Defendant Premier has agreed to be bound by Royal and Rurak's jury waivers, in an Agreement that is only awaiting signature. As part of that Agreement, defendant Agim Lozoja will be dismissed without prejudice.

24

### Conclusion

For the foregoing reasons, GE should be granted summary judgment on liability against Royal, Rurak, Onuki, and Colangelo and these parties' demands for a jury trial should be stricken.


Dated: December 11, 2008                    Respectfully submitted,


By:_____*/s/ Frank Peretore*_____
        Frank Peretore, Esq.